Good morning, Your Honors, and may it please the Court, Peter Antosiavian on behalf of Plaintiff Appellant Mavrix. Your Honors, the District Court erred here in three separate respects. The first two are related to personal jurisdiction. The District Court erred in concluding there was no general jurisdiction. The District Court also erred in concluding there was no specific jurisdiction. The third error was the District Court abused its discretion when, on this record, it denied any discovery whatsoever to my client to get to the bottom of what ultimately is a undisputedly large Internet celebrity magazine basically delivering content online. So, with respect to general jurisdiction, this case is effectively on all fours with Keaton v. Hustler. And I say effectively because one of those four legs in the Keaton v. Hustler case, it was a print magazine sent by traditional print methods. This is an Internet magazine. And as this Court knows, the jurisdictional issues, they change with commerce. As commerce evolves, the concept of minimum contacts and fairness evolves, too. Well, let's run over the facts of Keaton v. Hustler. It's a magazine that's published nationwide. As I recall, the suit was brought in, was it in New Hampshire? Correct, Your Honor. And the allegation was that the plaintiff was defamed in New Hampshire because of the circulation of the physical magazine in New Hampshire. And the Court says, yes, there's jurisdiction because you're alleging injury in New Hampshire because that's where the defamation takes place. That is correct, Your Honor. This is not a defamation case. I'm not quite sure I see that the case is on all fours. This is a copyright infringement case, and being specific, direct infringement and contributory infringement. Right, but the injury here is to Mavericks, which, if any, is to Mavericks' bottom line, its property and the value of its property in the photos. And Mavericks is a Florida corporation, and its principal place of business is in Miami. Why doesn't the injury take place there? Mavericks also has an office in California. It just has an office out here, but you would think what you're concerned about when you file a copyright infringement claim is that they're... Well, in fact, you allege in your complaint that they published these photos, but they're not in Miami. That you had procured... I can't remember what the... Oh, Fergie and Josh, somebody, and I'm sure my daughter can tell me the names. That you procured these pictures, and by them stealing the photos and publishing them first, they took away all value of those photos. Well, where is that harm? That harm is a monetary harm that hurts your company's bottom line. Are you private or public company? Private company, Your Honor. Private company, bottom line, and that is in Florida. I don't see how the fact that there's an office in California would put any injury out here. Maybe you have to close the office because you've lost so much money over those photos. I don't know. I just don't see it. My client pays tax in California, has a registered agent, pays minimum tax to avail itself of the benefits of doing business in California, and it has an office here. And this is a location of the corporation also where it's injured. In the Hustler case, Your Honor, neither the plaintiff nor the defendant had any connection to New Hampshire. The content happened to be published in New Hampshire, and the libelous content... But the injury took place in New Hampshire. That was a specific jurisdiction case. I don't think that was a general jurisdiction case. I believe it was a general jurisdiction case, Your Honor. Well, it's hard to characterize the Supreme Court as specific as general because the Supreme Court virtually never uses those words, and it did not in that case. Correct, Your Honor, and it was a unanimous opinion that really just focused on minimum contacts, what's the nature of the business that's going on by this company, and it's a ubiquitous nationwide business delivering content into all states, and that is what the defendants are here. It's undisputed. It's one of the largest celebrity Internet websites in the world. It delivers content into all 50 states. We know it delivers content into California because that's specific California-targeted advertising. Well, I would be much more receptive to the argument if this were Fergie suing for harm to her in California, but that's not what's going on here. No, it's not, Your Honor. This is – these are my client's pictures, which – and this is why it's important for both the general but also when we're talking about specific jurisdiction and you're looking at the active issue, it's not just the willful theft of the pictures, which violates 106, the reproduction right. It's also the contributory infringement claim. These pictures have been placed online to facilitate the download by the users of this very, very large website that has a significant amount of traffic. We don't know how much California traffic because we weren't allowed discovery, but we raised the issue. It's relevant under cyber cell in this circuit. But there has to be some commercial activity. Is there commercial activity in California? The entire business is a commercial business in California. And this is where – this is a question of first impression in the circuit. There's no doubt. Unlike Hustler that sells a magazine to the end user and the end user pays, here it's true. In the modern world of correspondence, him or herself, advertisers are because that person is clicking on the website and their eyeballs are on the website. And the modern world has facilitated the sale and delivery of that content. But the advertisers could be anywhere in the country. These cases are fascinating. These are all these website cases because we're trying to apply traditional principles that have been developed in other media to websites. So we've made up all these rules about how to pass an interactive and commercial sales or whatever. You're trying – I think the only commercial activity that you've actually shown a brand in California is when – was it you or someone in your office purchased a ticket for a concert out here? It was me who purchased the ticket. But that's not the only commercial business. And this is why when you go back to the Hensler and B. Depler case, 1958 Supreme Court, the language it reads as if it was written 10 years ago. It talks about how when you're looking at minimum contacts, jurisdiction commerce changes with the times. The business model today – and this is undisputed. It was in the declaration of Gareth Thomas. It's undisputed that the business model is different. The commerce that's going on in California is the delivery of the content to Californians who, when they look at that website, the defendant makes money. Well, they make – okay, the defendant makes money, but not from the person in California. The advertiser can be anywhere. We don't know where the advertiser is. The person who advertises and the Californian person maybe buys something from them, that could be in Connecticut for all we know. The advertiser could be in all sorts of different places, there's no doubt. But the defendant is getting money from that advertiser because people in California are looking at those ads. It's not because people in Nevada or Kentucky are looking at the ads. And the ads, by the way, they're targeted and specific to California. Then there's no limit, because people all over the country would be looking at those photos and looking and seeing the ads, and then that would mean anybody who has a website that contains advertising located anywhere in the country would be looking at those ads. When your business model is a national distribution of content, it's an online magazine. Absolutely you're subject to jurisdiction in every state. If you don't want to be, don't deliver the content. I mean, that's the nature of a ubiquitous nationwide business on the Internet in the 21st century. It's not just a website that people may go look at that's selling, for example, the Schwarzenegger case, which I know the panel is familiar with. This isn't a website if you took the Schwarzenegger case and made it an Internet case, right? You'd be talking about, okay, well, it's a little website in, I think it was Dayton, Ohio, I can't remember, but, sorry? Yeah, it was Ohio. In Ohio, advertising the sale of cars in Ohio, and sure, anyone in the country could go on the website. But the business model and the business model in this case is a question of first impression, and the prior cases in this court that have been published that have dealt with websites have all dealt with passive websites where what's underlying the website is just an informational page, for example. And the commerce isn't the website itself, whereas here the business model is the very website and the delivery of this content to people in California. With respect to specific jurisdiction, this panel and this court, this court, I mean, and this panel and members of the panel in the Schwarzenegger case were very, very careful to identify focusing on the intentional act, and the intentional act here is both direct and contributory infringement, and that act of contributory infringement is an act that gives rise to liability, and the liability is on the defendant's shoulders when they allow, they encourage their users to download, and those end users are infringers also, and they are contributing to the infringement that is occurring by people in all states, including California. That's why, after all, the targeted advertising is focused on California-centric ads. When you, with respect to then the second element of, you know, what's defined in, you know, what is the defined intentional act expressly aimed at, and that seems to be a key question in this case, that, too, is a function of the tort. And when you have a website that's designed to deliver content to users everywhere, to facilitate their then infringement, you are expressly aiming it at all your users, and that gives rise to contributory infringement liability on behalf of the defendant. Within this context, one of the issues that I know is present in the briefs and has been addressed is the issue of knowledge, and their knowledge about, or the absence of knowledge about whether my client had any connection to California. And here I think it's very important to look at the Topin case, and the facts of the Topin case. When you look at the intentional act in Topin, it was trademark infringement and trademark dilution, and that's it. That's what the claim was about. Those acts occurred before Topin had any idea that Panavision was a California company. He later learned that Panavision was a California company because of the letters. But those letters that he sent weren't an issue in the case. That wasn't the act of infringement, the intentional act. So the knowledge in Topin was one of, and the Ninth Circuit said it there, Panavision is a movie company, and California is the center of movie industry. But in that case, as I recollect, and that wasn't my case, but as I recollect, the suit was being brought in California where the principal, I think, place of incorporation and headquarters? It was a Delaware company, Your Honor. It had an office in California. It was its principal place of business in California. I was going to say, its principal place of business was in California. So that the injury then, if we're talking about where is the corporation that is being injured, the corporation is in California. Whereas in your case, your client is in Miami. And California, and I'm not sure the law says that a corporation is only injured where its principal place of business is. The law is actually ambiguous on the point. Topin didn't address that at all. But what's important about Topin is that Topin himself, factually, he didn't know when he engaged in the trademark infringement and trademark dilution that Panavision was a California company. Rio is a similar case where this court said to a Costa Rican company, hold on, Nevada is at the center of gambling. You know you're dealing with a celebrity online magazine. The epicenter of celebrity culture is Southern California. That's undisputed in the record. The Supreme Court, I don't know if they're going to adopt this principle for purposes of subject matter jurisdiction, but for purposes of diversity jurisdiction, they just decided that the headquarters is the nerve center, which is where you measure whether or not there's diversity jurisdiction. Didn't they just decide that this year? And I mean, that is a diversity jurisdiction. I don't know if they're going to maybe come to that sort of conclusion with respect to websites and the corporations that own websites, if that's going to be an analogous way of looking at it. I don't think it is analogous, Your Honor, because on the diversity question, the question is citizenship. Of what state are you a citizen? Here we are talking about a corporation that pays LA photographers. It has an office in LA. It pays tax to California. The reason it does that is because if you're going to be taking photographs of celebrities, you need to be here and not in Kentucky or somewhere else. But weren't these photographs taken in Jamaica or something? The Fergie photographs were taken in the Bahamas, but the Lindsay Lohan, Christina Aguilera and all the other celebrities, those were taken in California by photographers. Photographs can be taken anywhere, right? Photos can be taken anywhere. Absolutely. Photographs of celebrities can be taken wherever the celebrities are. But when you're talking about these concepts from Rio and from Topin about what is the epicenter of a business model built around celebrities, in this record it is undisputed. It's California. My client pays taxes in California to avail itself of being able to pay photographers to take photographs of celebrities in California. It is a citizen of California. And the fact that it has a registered agent, it pays tax, this is public record information. A defendant should be imbued with constructive knowledge of that. Well, is there any evidence in the record that this defendant knew that you had this office in California? There's no evidence in the record that they knew my client had an office in California. There is evidence in the record, and it's undisputed, that they know and the market knows California is the center of celebrity culture. And there's no reason that a willful infringer who chooses to steal someone's photographs should be able to say, we had no idea where you were. I mean, they may have no idea where anyone is, but it's a matter of public record that we have a California office. And in other circumstances, for example, if I went out tomorrow and registered judgewardlawjurisprudence.com and I tried to get a trademark from the U.S. Patent Trademark Office, I'm not going to, but if I did, that gets published for opposition. And if you don't do anything in 30 days, you're out of luck. You have to go to federal court later to challenge that. And you're completely innocent to the transaction. And this is in all contexts of law. There's constructive knowledge. And we cited in our reply brief some cases that deal with that. There's no reason when we are dealing with an analysis focused on fairness, avoiding random, you know, fortuitous coincidental touches with the state, that the same concepts of constructive knowledge shouldn't apply when it is a matter of public record. If you want to willfully steal someone's photographs, be careful, is the point. And that's not an unfair point, especially for a company that's got one of the largest websites in the world. And this was an undisputed fact. It was also ignored by the district court, which goes to my final point, as I see I'm running out of time, and that is, it was an abuse of discretion on this record not to allow discovery. We think it's clear that this case should be reversed. There's general and specific jurisdiction. But if it's not clear, it's hard to imagine how it's not. Awfully close, and there's not a lot that needs to be looked at. The defendants were put on notice that Cybercell is an important case in the circuit that talks about the number of visitors. They may have more than 10 or 15,000 subscribers and visitors to their website than Hustler had in New Hampshire. We don't know. They chose not to offer that evidence. When you're talking about a personal jurisdiction inquiry where the facts are interpreted in the light most favorable to the plaintiff, and there's relevant evidence that's in their possession that's not given, why would there not be an adverse inference the way there is in other contexts of the law? There should be an adverse inference against them. This is just symptomatic of the issues that, at a minimum, we should have been allowed discovery to see what are... There would be personal jurisdiction over this company in Ohio, right? Isn't that this Ohio company? It's an Ohio company, and I'm not sure if it's in the record, but I think during the pendency of this appeal, it sued my client for debt relief in Ohio, which I think has been dismissed pending this court's claim. And this is an important point, actually, because what it shows is if my client, if the only way my client can imbue them with enough knowledge to get personal jurisdiction in California is to send a letter, then you're telling willful infringers, wait to get the letter, DJ them in your home forum. And so you're telling the victim that they never get to sue in their home forum until they risk getting a declaratory judgment claim against them in another forum. But that's a little extreme. That is to say, if your client has a home forum, it's probably Florida. That is to say, that's where your client's home is. My client could sue in Florida. My client could sue in California, and it's our position. My client can sue wherever it wants, because this is a national business. There may be venue questions, but this is a national ubiquitous online magazine. It's just Hustler in the 21st century, and the pictures aren't pornographic, obviously. But Hustler made money directly. I mean, in terms of your business model, Hustler made money directly. When someone bought the magazine and the location, right? Correct. Okay. And your business model, you make, your client makes money from third-party advertisers, not from the person who's clicking on to see the photos. And that is not correct, Your Honor. And we're talking about their business model. Okay, their business model. But your business is the same, right? Aren't you competitors? Not really. My client's main business, my client does have an online celebrity. It puts its pictures online also. But a core component of the business, and we're outside the record now, but it is taking these photographs, and then it sells them to People Magazine, the Daily Mail, and all these types of venues. And it has photographers and its own staff people who collect the content. So how would one steal your photos, as you're alleging? My client has them online, and there are other... With a copyright notice. They're online with a copyright notice. I don't, it's not on the record. I'm not sure if they put the C with the date. There's no requirement under the law, as you know, to imbue, under the 76 Act, a C and a date. But they're my client's images. How they're surreptitiously stolen, we don't know. We're waiting to get a discovery to find out how exactly they were stolen. I suspect they were just taken from my client's website without permission. I mean, what we know is the defendant, there is record evidence the defendant recognizes that photo images may belong to other people, because they do actually note on some of the images that it belongs to someone else. And if you flip through some of the images, it tells that they belong to you and you can't download, and you agree not to download. Sure. I mean, I can tell you, we are outside the record. My client offers its content to the Daily Mail online, to People Magazine, and makes clear restricted use, not for online, only for print media. You know, not for print, only for online. We have to negotiate terms. I mean, that stuff's out there. It's not in this record at this point. All right. Well, let's, does anyone have any other questions? Okay. Thank you. Good morning, Your Honors. Andres Quintana for the appellee. I have just four points I want to make. First, with respect to the knowledge issue, there's evidence in the record that ER 312, it's a supplemental declaration of my client, Mr. Mandel, that said we had no knowledge that, in fact, these folks were not from Florida. We had communicated with them in Florida. We had communicated with their, with Maverick's counsel in Florida. There was absolutely no, nothing in the record that contradicts that. There were no e-mails from anybody from California at Maverick's. So all the deals, all the discussions were between Maverick's in Florida and Ohio and the Maverick's Florida lawyers. And was this discussion before the alleged infringing act, or is this all after? This is all after. This is all after. There is no knowledge at the time that they were actually doing So you might not even, your client might not even have known they were Florida beforehand. Right. They only knew about Los Angeles. But if they didn't know they were Florida, oh, that isn't... Well, they knew until they got some sort of letter or some sort of telephone call from the Florida lawyers. That's what they thought. They said, oh, wait a minute, this is a Florida company. They never knew that it was a Los Angeles company. But at the time of the alleged illegal act, it's your contention that you had no idea where this plaintiff was? I don't think my client, I don't know if there's anything in the record that shows whether or not my client knew Maverick's was a So as far as your client knew, it could have been California? It could have been Timbuktu. Yes, it could have been California, it could have been Florida. I think it was only after they were communicated, they were contacted by Maverick's. I mean, we would, after Maverick's and Maverick's Florida counsel contacted them. There's nothing in the copyright notice also says Florida. There's a copy of registration that they attach to the complaint. It's ER 36. That one has... We're talking about at the time of the alleged infringement. At the time of the alleged infringement, there is no evidence to show that my client knew that Maverick's was a Florida company or a California company. So is it your position then that assuming that your client stole these photographs, you're from Ohio, your client can get online, steal the photographs, not know where they're from, and the only place that you can be sued is Ohio? Well, the only place... That's a pretty clear question. Yes, no, yes, no. They could be sued in Florida. To the extent that Maverick wants to file a lawsuit and say, hey, wait a minute, we're headquartered in Florida. That's where the injury took place. Maverick could file a lawsuit in Miami, Florida, or Orlando against my clients in Ohio. So there are actually two places, Ohio or Florida. And if, in fact, we get a suit filed, like, once our decision comes down, in which you win, I'm hypothesizing, and they file a suit in Florida, are you telling me you're not going to object to jurisdiction in Florida? I think there's less of a claim for us to make, for my client to make with respect to jurisdiction in Florida, because that's where they can claim the injury took place. You didn't answer my question. I guess I heard the answer is yes, you will object. I don't know, Your Honor. I don't know, in that hypothetical situation, whether or not we would object or not. But that comes back to Judge Lynn's question, which says you maybe think the only place you can be sued is your corporate headquarters in Ohio. There are only two places where they could be sued. Either A, in Miami, Florida, because that's where at least the injury took place. That's where, allegedly, Mavericks is headquartered, or Ohio. Obviously, we believe to the extent they're asking for a lot of the witnesses and discovery, most of that is in Ohio, because that's where all the evidence took place of the alleged downloading, the alleged profit center, the alleged witnesses that are going to be testifying. In a copyright case, you don't really have a lot of witnesses. It's all based on where are your servers, where is the stuff being stored, how much money did you make. These are financial records. A lot of the stuff is in Ohio. But theoretically, they could sue in Miami or in Florida, because that is where Mavericks is headquartered. For sure that they cannot be sued, I don't believe that there's a satisfied general or specific jurisdiction to actually file a lawsuit and maintain a lawsuit in California. Well, I'll tell you the one argument I think that I find appealing. Well, there's a couple. This isn't as cut and dry as the district court made it seem. Your client provides celebrity gossip, news and photographs, and you're being sued by a celebrity photography agency. It seems to me that most of the celebrity and celebrities do come from Hollywood. I mean, they live here, they work here, and they're, I would say, this is a play, they go to prison here. You know, it's there. And the paparazzis here outside restaurants all the time trying to get pictures of the celebrities. When you think of celebrity, you don't think of Ohio. You don't even think of Florida. I mean, yes, vacation in Florida. I don't know too many vacation in Ohio. So, I mean, what in your company is all about celebrities? So, what other location is it thinking of than Beverly Hills, Hollywood? I would say that at least there's one golfing in Tiger Woods who lives in Florida that would disagree. Okay, there's one. Well, I mean, South Miami, there's quite a stir with respect to celebrity scene down in South Miami. They make shows about that. And to the extent that I lived a little bit, you know, spent some time back east, New York City also would at least make an argument against that, that there's quite a bit of the art scene and Broadway and a lot of the... Yeah, they're celebrities in their own minds. I lived back there for some time. I mean, they would argue that that is... People Magazine, for example. I haven't been on your website, so sorry. People Magazine, all the pictures are sort of, it's Hollywood-centric if you look through it. I know my children subscribe to people. I guess it's just a kind of compelling thing that this is the entertainment capital of the world and that's what you're purveying. So why wouldn't it occur to you, to your client, if they were stealing celebrity photos, that they could be sued in the entertainment capital of the world? Yes, there is a theory that they could be sued in California. It's hard to say that, well, you know, is it possible they could have been sued in Miami or New York or in Las Vegas or even in Ohio, I presume, or in Chicago. Do they send their celebrities and their basketball players in Chicago? They could argue they would be sued in any major city in America. The question here is whether or not they had knowledge, whether or not there was specific general jurisdiction at the time of the events that took place. And that's sort of a point that is addressed in the steel versus U.S. They make a big, spend a lot of time talking about the fact there's this Fox contract or Fox News, there's this email, there's this blog and all that. But if you look at specifically what they did, and this is not really addressed in the district court case, and that is that the steel versus U.S. case says, okay, for notions of fair play and jurisdiction, we're going to look at the events at the time. For jurisdictional purposes, look at the events at the time the dispute took place. And what they did, essentially, if you look at the complaint, they attached, if you look at the complaint, they actually attached photographs or images, downloaded images from the website as the website appeared back in, I guess, April 2008. And if you look at the, and that begins at 37, ER 37. And at ER 37, there are no references to the blogs or to the emails or to Fox or to the phone. Yes, there's a column here for Macy's and for Wal-Mart, but that's the only advertising in any of the photographs, any of the webpages, that appear between ER 37 through ER 71. And those are the ones that were attached to the complaint, and those are the website images as the website appeared at the time of the events took place. Let me ask you this, if I might. I'm struggling with this question as to where the injury took place. And the case law, not just our own case law, but the case law throughout the United States, has trouble with that when you have something other than a physical injury. Okay, if you cut off my arm in California, I know where it took place. On the other hand, if you're imposing, causing financial harm to a corporation, where does that harm take place? Maybe at the corporate headquarters, even though all the acts complained of took place somewhere else. But maybe the harm was suffered for purposes of jurisdiction where the act took place. I think there's some cases that will do that, and that's probably easier to do when they're physical acts that took place in a defined place. Here we have acts, most of which have consequences in cyberspace, so the where is really hard to figure out. But it's very obvious that the monetary value that these photographs had before your client stole them. I'm taking the allegations as true. You don't have to assume that I'm concluding your client did. But the monetary value that these pictures had before your client stole them is destroyed because all of a sudden everybody's seen them. Well, where's everybody existing who's seen them? Well, a lot of the everybodies are out here. So why am I supposed to think that the harm didn't take place in California? And I'm not really talking about where the celebrities are. I'm rather talking about where are the people who otherwise might have paid to see these pictures, but now they don't have to because they're seen up on your website for free. That's where the witnesses are potentially, but where actually the person that was actually harmed is located in Florida. Well, that's where the corporation is. We understand that. But I'm trying to figure out how do we conceptualize place of harm because we know in the case law that the harm is not only where the corporate headquarters are. Well, the place of harm, I would posit, can only be two places. It's where the actual, to the extent that the harm happened when my client allegedly took these photographs and put it on its website. That was done in Ohio. So to the extent that that created the harm, that created the injury, there's the infringement. It's the unauthorized reproduction of photos. That occurred in Ohio. Now, to the extent that there's some monetary injury related to that, that would arguably... Do we know that for sure? I'm sorry? Do we know that for sure? I think we're... Well, it's not on the record, but they didn't do that in California. They don't have offices in California. Their servers are not there. It doesn't necessarily have to have been someone who was in the office to have done it. We don't know that. We don't know. We don't know that. But we don't know how it was done or where it was done in the record. But the way it works is that ultimately the images are loaded. They're on a server. Those are not located in California. But nonetheless, the only two places where that could have happened, A, the location of where the pictures were actually uploaded by my client, allegedly, that place, or where the actual resulting injury, the foreseeable injury of that, and that is with a corporation, and the headquarter of the corporation is in Florida. I think those are the only two places that one could reason, I think. Everything else is just a stretch. Well, if you were talking about the concept of purposeful direction, you wouldn't be conceding that you had a purposeful direction with respect to Florida because you didn't even know they were in Florida. You don't have any more of a relationship with Florida than you do with California. So inevitably, your approach kicks you back to Ohio. So although this injury occurs wherever it occurs, you don't care about injury. Your position is there's no purposeful direction anywhere because your client doesn't find out where they're from, so we're kicked back to Ohio. That's a difficult policy for this court to adopt, that an infringer is liable only where the infringer is located and not anywhere else, despite where the injury might occur. You don't really care about injury. That's not your approach here, is it? Yeah. I agree that, I mean, well, with respect to purposeful direction, here that I think that the law is pretty clear with respect to that. I don't think they've established a purposeful direction, and I don't think that to the extent that they are. Well, let me interrupt you for a minute. Is that true because your client is ignorant? I don't mean that as a pejorative. Ignorant of where they are and makes no effort to find out? The answer is true, yes. Okay. And so from your point of view, this distinction between they have a little office in California, they have a big headquarters in Florida, that's an irrelevant distinction. Your client doesn't know about either one of them. My client doesn't know about either one of them. Well, it's completely irrelevant to what you're doing. It's irrelevant to what we're doing. And to the extent that the court says, well, the case law says, well, okay, with respect to Internet, though, understand what we're talking about copyright and purposeful direction deals a lot with torts. And here there's copyright is sort of casting torts. Courts have said that, well, okay, well, the Internet is kind of different because it's really hard to show that purposeful direction. And so instead we're going to apply the purposeful availment analysis. There's sort of two, purposeful direction, and then because the Internet is kind of funky and different and a little more complex, we're going to apply something different called purposeful availment, which some of the courts have distinguished as two different things. And then we get into the whole other purposeful availment, then goes into sort of the interactivity of the website and another analysis that is probably, you know, which the court addressed, the trial court addressed, and we addressed in our papers. With respect to purposeful availment issue, to the extent that that is something different than purposeful direction, we would posit that the only evidence that's relevant here is the way the website looked at the time of the injury, of the alleged injury. And those images are attached as Exhibit A to the complaint. They had those websites. They attached it to the complaint. There's no references to the blogs and newsletters. That website changed in May of 2009. There's declarations to that effect. And that's why when in June of 2009, that's when plaintiff's counsel can go on the website and say, hey, look, now that we've filed the lawsuit in April 2009, we filed our motion in June of 2009. Well, you know, under your theory of the case, I'm following along on Judge Lynn's line of questioning, under your theory of the case it really does sound as though because you don't know where the plaintiff's corporation is headquartered, where they do any business, where they have an office. The only place you can be sued is back home. But that seems preposterous, that you can do all kinds of harm, or your client hypothetically could do all kinds of harm to people located all over the country by their actions of stealing photographs or whatever they're going to do, and your answer always is, well, come on back to Ohio and sue us. That just doesn't seem right. So how do we sort of integrate into the case law that we have a result that seems more intuitively correct? And I'm wondering, well, maybe one of the things you should do is figure out, okay, the underlying idea is that you've deprived this plaintiff of something of value. And the way you've done it is that you've publicized these photos that are valuable to them only when they have the right to exclusive use. And once you've publicized them, you know, they've now become worthless. Well, where did they have the greatest value before you did that? That's probably the place where most people would have clicked on them to watch. Now, it could have been sold at the Daily Mail, but I don't think the Daily Mail cares much about Fergie. But maybe people in California do. I had never heard of her until yesterday. Let me respond. The record should reflect, I know who Fergie and Josh Duhamel are. I actually worked out with Mr. Dutadell at the gym once. But two things, two responses. One, with respect to the analysis of, well, regardless of the harm, regardless of how my client can do a lot of bad things, just focusing on Ohio is not reasonable. That's true if you apply the purposeful direction analysis. But what they did here is that there's still room in the law to say, wait a minute, you're not just applying the purposeful direction. You can, because it involves a website. Well, we have a website and a lot of things, you know, and it's a different analysis. That's why the courts, the Ninth Circuit as well, looks at purposeful availment as being something different than direction. So there is room in the law. Yeah, all those words are so abstract. What about the Keaton case? Okay, let's come back to that one. So Hussler publishes a story about Keaton defaming her, at least that's the allegation. It's not dirty pictures of Keaton. Keaton is associated with the Bob Guccione penthouse, and so the article is defamation. They're really trying to get at Guccione. And they publish it all over the country. Keaton waits too long to file a suit, so the only state in the country that has a statute of limitations that hasn't run yet is New Hampshire. So she brings suit in New Hampshire. As far as the records show, she's never been to New Hampshire in her life, never intends to go to New Hampshire. But the court says that she has suffered sufficient harm in New Hampshire because of the damage to her reputation in New Hampshire, a reputation that was nonexistent, pro or con, before the distribution of the magazine. So if that's enough harm to support a lawsuit by Keaton, as far as the records show, has never been to New Hampshire in her life, why is there not enough harm here in California in the sense of economic harm to support a lawsuit? Well, it's totally that point. That was a very specific allegation. Here, there's nothing in the record, and I think it's speculative to say that in California that there would have been greater harm, there would have been any. Well, here's what bothers me on that point. It is speculative. It's because the judge didn't allow discovery on the number of hits. I mean, we could tell by how many people in California as opposed to other parts of the country. I have no idea how. I'm not a techie, but I don't know how it's possible. You can get logged in. The other case we just had, it was absolutely possible. They measured the number of hits. Oh, number of hits, sure, number of hits. But in terms of the origins of those hits, you see, whether or not they're in Los Angeles County or just California versus, you know, Wi-Fi over some airplane, you log in. I think we had evidence as to where they came from. Excuse me? In the other case, we had evidence of where the hits came from. As to the origins? I would respond to – I'm not a techie. I don't know if that's possible. I know. I'm just saying that that's the very discovery that was sought here that the district court didn't allow. But what the Zippo case talks about, which was then talked about in the CyberSell case by this court, is that it's not the quantity, it's not the number of hits. If you have 10,000 hits, it's the quality. It's whether or not people are actually clicking, going to the website, signing up. It's not just looking at the website. That's not the one I want. But you could measure the value of those photos by how many people were interested in them. Well, if you look at the website based on at least the pages that were attached to Exhibit A, there's a lot of other content there. There could be other celebrities, a perfectly legitimate – It's an argument about what were they really looking at. But I guess suppose – and this would be another hypothetical, but suppose – I asked your opposing counsel, isn't the harm in Florida? Because you're a private company and that's where you suffer your economic damage. But the company actually has an office out here, so the financial harm, if there is substantial financial harm, and there may be, because there's allegations that your client didn't just download Bergie and Josh, but they downloaded other celebrities as well, that could be felt everywhere in the company, wherever the company is located. If their photos that they sell, they make money off of by selling them exclusively, are being stolen by someone else, over time their entire profits could go down. People could be laid off. So the economic injury could be felt, and we could find the economic injury was felt in Los Angeles throughout the company because of the way companies work. People get lower pay if their company is less profitable. Theoretically, that's possible. And hypothetically, because they didn't realize this revenue that would ordinarily be invoiced and money received in Florida, I guess that's less clerks they have in California or less revenue to keep that office open. I think I'm troubled by, in both of these cases, the deliberate ignorance that the defendants are maintaining in order to avoid the purposeful direction, specific jurisdiction. But anyway, we're way over. I mean, I think we have to talk about it. Thank you. All right. Thank you very much. I have one question for you. You don't really have any time, but I just have one question. What was the discovery you were seeking? Your Honor, we would have done discovery depositions of the defendants. We would have secured documents. We would have served subpoenas on Google. I can represent to the court I've had numbers of cases where we go get the Google analytics data. You can trace the IP address, and you find out where the users are coming from. We would look for that discovery to find California-specific users who also infringed because of their contributory infringement, which then is occurring in California. I mean, when a California user steals a photo in California, my client is damaged in California by that California person, and the only place my client can seek redress then would be California. So it was a... You're now hypothesizing a suit against somebody else. No, I'm saying that is the underlying basis of contributory infringement, which is why when you're talking about the harm, we also have to look at, it's not just the taking of the picture, which may have been taken from a server somewhere. It's... The claim is direct infringement and contributory infringement. And if I may just finally frame what you were talking about, Judge Wardlaw, you were mentioning the celebrity center California issue as an issue. We can frame that very, very specifically. It's an undisputed fact in this record. It's not just an idea. If you go to ER 213, it was asserted by my client, and it's uncontroverted that your sense is true. This is the epicenter of celebrity and celebrity culture, unless the court has any further questions we would submit. All right. Thank you, counsel. Thank you. We will submit Maverick's photo versus brand technologies and take up Zans versus nailing services.
judges: Lynn, Wardlaw, Fletcher W.